Petitioner v. National Labor Relations Board. Mr. Deidelberg for the Petitioner. Mr. Hickson for the Respondent. Good morning and may it please the Court. Joshua Deidelberg appearing for XPO. I'd like to focus my presentation on why the election should be re-run even if the Board is correct about the facts of the 9th incident and given the deference that it typically receives in election matters. Where did you make an argument below that even if the Board was correct as to the 9th incident that that was something done by the company's employees, the election should nevertheless be re-run? I'm sorry. Where did you argue that below? That even if the company was responsible for the 9th incident and was in the wrong, the election should nonetheless be re-run? Right. The objections that we raised before the Board, which we note at page 6 of our reply brief, state broadly that we're challenging the effect of the incident on the employees. We go into some detail. No, but when you reference the incident there, were you talking about the incident as in the company inflicted the incident? I did not see that argument anywhere below presented to the Board that assuming, and I saw it in your reply brief here for the first time, did not see it to the Board at all. Of course, you know things have to be argued to the Board for us. Sure. In the objections to the Board... Do you have a JA course? I'm sorry? Do you have a JA site for that? 770, they're referenced at page 6 of our reply brief. Yeah, but I wouldn't see them. We argue broadly that the effect of the incident and described... Which one are you talking about? Can you tell me which number? It's, I believe, 770. I'm on page 770. There's a whole bunch here. I believe it's exception 280. That's the finding and recommendation that Polensi never threatened Camerina with a knife lacks a factual foundation. I don't think that's what you're saying. Yes. That's challenging the factual foundation for finding that Polensi didn't have a knife? Well, the gist is we explicated in our briefs before the Board is that we were broadly challenging the dissemination of the incident. That's a factual argument. That's not a legal argument. Well, regardless of the source, regardless of how the incident actually played out. I mean, obviously... I'm sorry to pest you with this when you're trying to get started, but it's very important. It sounds like a legal argument to me that if, regardless of whether the facts broke as the ALJ and Board found them and the company had falsely, or its agent, had falsely accused Mr. Polensi of the knife incident and had him arrested, which led to discussion amongst employees. Even if the company was the source of the upsetting information around election time, nonetheless, companies should be able to have a new election even when they're the ones that caused the problem. That's a distinct legal argument I hadn't seen. Well, we would submit that the gist of the objection, and as further explicated in our briefs to the Board, is that they were going to have to grapple with the effect of this incident, and we repeatedly say incident, on the employees as a result of the dissemination of the incident. Right, but you'd have to persuade them as a matter of policy that somehow companies should be able to cause a disruptive incident, and then when the election doesn't go the way they like it, say, ah, that incident makes it an invalid election. You can imagine the adverse incentives, perverse incentives that that would... Okay, so I would have expected a... You have an argument about that specific legal question and concerns and those incentives presented to the Board? Well, there's no question that the primary thrust of our argument before the Board is that there was, in fact, an actual threat made. Was that the primary or the exclusive thrust? Well, again, the objection was cast broadly. Well, this objection is just a factual one, so it's not quite working for me on any legal argument. Maybe you have a different one. But you say your briefs to the Board made this argument? When you say the gist, that doesn't quite work. You have to put the Board on notice. And those excerpts made this argument? Is this something you did for the first time in your reply brief? I mean, in terms of refining it or honing it, you know, I think that's... Does refining it or honing it mean now focusing on the fact that even if the company was wrong? Is that the refining or honing you're talking about? Well, I mean, we would submit that, you know, the exception for purposes of 10E preservation was to get the Board to, you know, grapple with what the effects of the incident were going to be. It's a fairly broad objection. Moreover, the principal finding here, you know, of the Board was that... So I'm looking on JA 784, and you're still, you're talking about the incident effect on voters, but you talk about it's well-established that threats directed at management representatives. But of course, your argument now is assuming that there were no threats directed at management representatives. That's correct. So that's, okay. Maybe when you come up for rebuttal, if you have something more specific, that would, at least for me, be helpful. Sure. The Board's principal finding in the case actually was because it found that there was no actual threat, that there could be no valid objection. And that's simply contrary to their precedents and this Court's precedent in Manor Care, the Board's precedent in QB Rebuilders. It's clear that the focus is on the employee's understanding of the event, not what the actual event may have been. I mean, that's the nature of dissemination. Except in Manor Care, the company wasn't the source of the distorted gossip. That's true, Your Honor, but I think from the employee's perspective here, since they weren't witnesses to the event, there's really no difference, you know, than the situation in Manor Care. Where again, you're talking about dissemination of something that was not witnessed by the employees in question. And here you have a situation where it's clear, I mean, the Board has found, and the Board admits at page 8 of its brief, that employees understood, based on this dissemination, that there was a threat, or at the very least, that there may have been. And the record is replete with testimony that that was, in fact, the understanding of the employees. Right, but if we accept the findings on the knife incident, the company is the source of all of that. Yeah. Well, do you have any case, administrative or judicial, that stands for the proposition that the company can create the concern and then use it to invalidate an election? I don't, but there are actually very few cases at all in this area. The cases cited by the Board are from the 80s, and they stand at least in unresolved tension with what the Board does say, you know, repeatedly in Westwood Horizons, and the other cases that we cited, such as Sewell and Al Long, and the Court did in Manor Care, that there is a firm line with respect to employee free choice. I mean, the Board says repeatedly that it doesn't matter what the source is, you know, that it's irrelevant to what the employee's ultimate understanding is. I certainly understand. But the normal, I mean, the normal case would be one where union supporters are saying things, and there's ambiguity about whether it's an illegitimate threat or legitimate advocacy, and they're using this six-part test to draw that line. It just seems very different from dealing with this question of what happens when and if the company is the source. What Your Honor is describing is the usual case, you know, which is why I would suggest that the facts of this case are highly unusual. This is not a situation where the floodgates would be opened, you know, but simply, you know, given the Board's broad policy, there has to be something of a balance. And the facts here are quite narrow. This would be a third-party case. There would have to be a general atmosphere of fear of retribution. Why would it be a third-party case if the employer instigated the gossip? Well, because what we're talking about is the dissemination of the rumors by the employees, so those would be the third party. I guess if you're going to have this whole theory, you'd have to have findings on whether the company helped disseminate the story as well. Yes, although typically when you're talking about party from that perspective, it's with respect to the opposite party. And, you know, at least in terms of the Board's findings here. Well, all this typically unusually stuff, but in fact I thought you just said in response to Judge Katz's question that you're not aware of any case, Vera, that's dealt with an employer wrongfully instigated incident that leads to concern amongst the employees. That's correct. I'm not aware of any case. It is highly unusual. Even the cases that the Board had to go back to the 80s for their cases, only a couple, while the Board repeatedly expresses, you know, its general principle, its bedrock principle, as you noted in Manor Care, that there's a firm line in support. What about the blog posts and phone calls? The blog posts and phone calls, yes. Is there anything you can make of that? Right. Well, again, we're talking about a one-vote election. So it's hard to say what the tipping point would be in terms of coercive conduct. On the blog posts, you have a situation where, you know, a Teamster agent or outside organizer, you know, has clearly witnessed, you know, the use and accepted the use of the Teamster's logo on this blog. The communications in this blog use terms, you know, that have a lot of... Hang on. Were any of those communications on when the employee was on the blog? My understanding from the record is that the statements on the blog about what you're concerned post dated about by a month or so, or maybe even two months, when the employee went on the blog. Is that accurate or inaccurate? Oh, in terms of Mr. Diaz, the outside organizer? That is accurate, Your Honor. Okay. So all he saw was a Teamster's logo on the blog for purposes of this record. Right. But our argument is that he can't just bury his head in the sand. Well, how has he buried his head in the sand if all there was was a Teamster's log and no objectionable content? Well, he is ratifying what's going to be... All he can do is ratify at most. Even assuming your ratification theory is valid, the most he could ratify is what he saw. You have to know. It's a knowing. You have to have knowledge to ratify. Do you agree with that? Well, in... Do you agree that you have to have knowledge of content to ratify it? I think the Board's decision in West Bay has a broader definition or understanding of ratification. Does it require knowledge? You can ratify something without even knowing what it is? Well, we argue what he knows is the use of this logo. He's basically throwing open the gate saying, you know, have at it. As far as we're concerned, this is sanctioned by the Teamsters. Can I ask, on the blog posts, your argument, as I understand it, is that the Board, or I guess the ALJ, impermissibly considered what you call subjective evidence. Yes. Which is the reaction of specific employees. That's right. What's wrong with that? It's an objective test. Everyone agrees the test is objective. But why isn't it relevant in an ambiguous situation, assessing whether this is really a threat or not? Why isn't it relevant to consider whether particular employees did or did not feel threatened? Yeah. I'm sure it has some relevance, Your Honor. I mean, I think there's always conceptually, you know, sort of a difficulty in terms of the blurring of lines between, you know, what is an objective and reasonable person standard and how one derives that. But there really isn't any solid finding in terms of objectivity, you know, with respect to these blog posts. What the Board is doing here is basing its findings really exclusively on the subjective reactions. I thought they considered both. I thought she considered both. She says, she starts off by saying, Lopez thought it was a threat, but then he didn't. Robles thought it was funny, et cetera. That's all subjective. Then she goes on to say she correctly defines the governing standard as an objective one. And then she talks about a reasonable tendency to influence the outcome. The statements lacked specificity. They were merely derogatory and unkind. Seems like she's looking at both, and reasonably so. It's a close question, Your Honor. I mean, I saw her focus on them being reasonable and unkind is really being derived more from the subjective reaction of those particular employees rather than the effect of a situation where you have a blog and you have people being, you know, called punk and rat, you know, which have specific, you know, pejorative context in a labor matter, and also with respect to anonymous phone calls, you know, being made to Mr. Robles, you know, who was referenced in the blog, you know, that you have this entire situation and scenario whereby the overall effect of this blog is to chill employee speech. Thank you very much. We'll hear from the government now. Thank you. Good morning, Your Honors. May it please the Court. Michael Hickson for the NLRB. The Board acted within its broad discretion in overruling the company's election objections here and certifying the union, and we respectfully submit the company has not met its weighty burden before this Court to prove otherwise. I would go straight first to the alternative argument that the company belatedly raised before the Board concerning the basis for Excuse me, Your Honor. Before the Board? Before the Court. Did I say Board? I'm sorry. Before the Court. As we say in our brief, and I'd like to explain here a bit further, we think that argument is both jurisdictionally barred because the company failed to ever raise it before the Board, as well as utterly meritless and unsupported. On the jurisdictional bar, Section 10e, of course, requires that the company first raise and affirmatively urge before the Board any contention that it wishes to preserve for appellate review. The company is frankly just wrong in claiming, in reference to the JA sites it has at page 6 of its reply brief, that the company raised this argument before the Board that if the threat never happened, nonetheless the baseless rumors themselves provided their own grounds to overturn the election. Rather, the company was absolutely consistent and unwavering in its claims before the Board in asserting that this threatening conduct did actually happen. It only then asserted as an additional element of that objection, or to further bolster that objection, that that conduct that actually, factually occurred was then disseminated amongst the employees. And I would direct the Court to appendix page 772 and 773, 774. Those are two pages that the company actually cites in their reply brief at 6, claiming that it made this contention before the Board because it made claims about a, quote, incident. However, if the Court looks at those very appendix pages, which the company is relying upon, they're very clear that when they say the incident, they mean the incident of the threat actually happening. For example, at page 772, the company says, this is in its brief in support of exceptions before the Board, the company says, union organizer, and this is where the company is defining its only objection concerning Mr. Plasencia. It defines it as union organizer and Agent Plasencia's threatening of Camarena with a knife at ULX on October 7, which incident was widely disseminated among the employees. Similarly, at appendix page 773 to 774, the company defines the very incident, which it goes on to describe in the following pages as, quote, the incident in which union organizer and Agent Plasencia threatened Camarena with a knife on October 7. So consistently, its contentions before the Board focused on and were premised on this threatening conduct happened. It never raised the alternative argument before the Board that it now brings to the Court, and therefore, Section 10E precludes the Court from considering it. In any event, the argument is completely baseless. The company has cited no case that stands for the general notion that an objecting party, the one who lost the election and seeks to overturn the results, can draw upon or rely upon conduct, which it itself created or contributed to, to then avoid a result of the election that it does not like. This would, as Judge Millett noted, create powerful and perverse incentives for every employer, well, many employers, many unions in many, if not all, elections to similarly plant the seed of false rumors among the electorate so that if it loses, they have something to fall back on. The company notes that this case is rare, and it is rare because parties are seldom so bold as to rely on their own conduct to try to overturn an election. However, if the Court were to embrace the company's position, I would submit that this might not be so rare anymore because parties now see, hey, we have a little insurance policy we can create for ourselves by planting these baseless rumors. I guess that I would just say that, again, while the company has not cited any case, we have cited cases that, well, that stand for the proposition, again, that simply that an objecting party cannot rely on its own conduct to throw out an election. We have the United Builders case and the Baird Polling case we cite in our brief. I'd also note that I kind of wish I had pointed this out in my brief, that the Court, although it's in a different circumstance, in the Amalgamated Clothing Workers case, the 1984 Amalgamated Clothing Workers case, because there are a lot of them, which we do cite in our brief, the Court does identify the general concern, although in a different context when it's discussing anonymous conduct and why it is, or one of the reasons why anonymous conduct should be given little weight. And that's, the Court says, one of the reasons is that, quote, an unscrupulous employer could encourage anonymous pro-union incidents in order to give it grounds, dot, dot, dot, later to reverse the election result if it loses. So although it was in a different situation discussing anonymous conduct, here it's not anonymous. We know that given the credited evidence, it was in fact the company that created and perpetuated these false rumors. Nonetheless, the Court there did recognize, I guess, the general concern. Can I take you back to the knife incident itself? Yes. So one aspect of the ALJ's reasoning was that employees who testify for the union are deemed to be inherently more credible because they're testifying against their economic interest. Doesn't that seem like it's really loading the dice, particularly with regard to, in this case, employees who were known to be union organizers? I don't think so, Your Honor. I guess my first response to your question would be that the judge's credibility analysis was incredibly thorough. I understand that. And the point that Your Honor is making, while relied upon the judge properly, appropriately, we assert, nonetheless, that was just one facet of a very detailed analysis. So let's put aside, just for a second, put aside any question whether that was harmless error. Sure. Let's just talk about whether this was defensible. Sure. You know, there's a dispute here. There are workers allied and known to be allied with the union who testify in favor of Placentia's version of events. And there's at least one worker who's allied with management who testifies to the other version of events. And the judge says, oh, well, these people, this people union side are testifying for the union, and therefore they're more credible. It seems to me that strand of the reasoning seems to me pretty hard to defend. Well, Your Honor, I think, I mean, it is an established principle both in board law and court decisions. I know we cited at least one Seventh Circuit case in our brief that does uphold that principle. And the company has not challenged that principle and has not cited any case for court otherwise that suggests that that principle is inappropriate or that suggests that that principle cannot be applied in the circumstance of employees who are, you know, union advocates or activists. And, you know, the fact remains that these employees continue to rely on their employer for their livelihood. And so by standing up. And yet they've chosen to advocate very publicly within the company for the union. That's true. They've, for whatever reason, calculated that their interest lies in supporting the union. Nonetheless. And that's fine. But why don't we just. Well, nonetheless, Your Honor, they reasonably may perceive that they may draw additional ire from the employer by further countering the employer's interest by standing up in a hearing and testifying contrary to their employer's position who controls their paycheck. I thought ALJ had even gone out of her way to say that as to Placencia, she acknowledged he looked at things through a pro-union lens. That's true. He took that into account. That's true. Reverse to him. That's true, Your Honor, as to Mr. Placencia. She did specifically acknowledge that, again, that the credibility analysis was very, very unusually detailed, to be frank, and relied on demeanor, inherent probability, consistency, corroboration, contradictions between management's witnesses, a whole host of factors. Let's see. About the blog posts, I guess I would turn to those briefly. The company, the board recently found these anonymous online statements that over which the union had no control did not form a basis to overturn the election. The company, I would note, has cited no case where statements in any way similar to the statements that appeared on this blog have been held sufficient to throw out an election. And that's under any standard, under the third-party standard, under the party standard. The company has not cited any case where statements that look like something like these have been enough to overturn an election. The statements really, in large part, were nothing more than general kind of insults, name-calling, mean comments. And you don't overturn an election based on mean comments. I'm over my time, Your Honor. Just one question on that. On the subjective evidence point, your main argument in the brief was that the ALJ did not consider subjective evidence. Seems to me wrong. But would you be disappointed to win your case on the ground that she did consider subjective evidence but only as relevant to the objective question of whether these comments objectively measured amounted to threats? I would not be disappointed, Your Honor. It is our position that the judge did not actually rely on the testimony about the subjective reactions. But it is nonetheless true that both the board and courts have at times said, yeah, it's an objective standard. We're going to analyze it under the objective standard. But then have made reference to testimony. Like in Mannard here. I believe so, yes, Your Honor. Then have made reference to evidence of employees' subjective reactions and taken that into account or said that that bolsters or confirms, I guess, the conclusion about the objective conclusion. I have thought the point of the objective test was that if people are engaged in objectively unreasonable or harmful or threatening behavior, they don't get off the hook if they can point to some employees who are particularly hardy and say they were unaffected. Well, that's true, Your Honor. That's true. But otherwise, in these types of tests, objective tests, I'm not aware of any context in which actual evidence of how people responded is not a relevant consideration in applying. I mean, maybe not the only thing you consider, but a relevant consideration in determining what's objectively reasonable or what's an objective tendency. Yes, I understand. I agree, Your Honor. And I guess that here I would note that given that the blog posts and the phone calls were appropriately analyzed under the third party standard. The company's burden is extremely high in that it was required to prove that objectively, objectively, the statements and the silent phone calls in which nothing was said. And we don't even know who made them or if they had anything to do with the election. That objectively, this conduct was so aggravated as to create a general atmosphere of fear and reprisal, rendering a free election impossible. And we, again, just submit that the company has not come close to meeting that burden. I'm happy to answer any additional questions. If not, the board respectfully requests that the court enforce the board's order in full. Thank you very much. Did Mr. Dietlberg have any time left? Counsel, does that have any time left? We'll give you two minutes. Just very briefly. As the court says in Manner Care, the board has drawn a firm line that the touchstone of an election is vindicating employee free choice. Elections are ultimately about the employees, not the parties. Although, curiously, in the board's rules, you know, parties such as unaligned employees actually don't have an ability to file objections to an election. I just want to impress upon the court how narrow and how unusual the facts of this case are and why it would not open the floodgates, as the general counsel suggests, to employers or unions benefiting from wrongful conduct. Again, the standard here is the third party standard when one is talking about the dissemination of rumors. And the third party standard is extremely difficult to satisfy. It has been satisfied in this case because one is talking about hallmark threats of violence directed by if, you know, either. What's the threat of violence? Well, Mr. Placencia's, the employees, and again, the board does not dispute this, understood that Mr. Placencia, who at a minimum was a member of the union's organizing committee and potentially an agent of the union, threatened the primary spokesperson for the employer, you know, with respect to labor issues. An incident that so disturbed the employees that it was widely disseminated, again, per the board's finding, up through the entire election. I'm sorry, so you're on the dissemination point? I'm sorry? This is the dissemination? Yes, Your Honor. Got it. So you have, you know, dissemination of a threat of violence in a one-vote election in a situation where a hearing was held, you know, with respect. So at least there was a finding that the objection had prima facie validity. And this was not an incident made up out of whole cloth, but one in which there was, in fact, an incident. All right. Thank you very much. Thank you, Your Honor. The case is submitted. Thank you.
judges: Millett, Katsas, Rao